UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


ROSALINE BANGURA,            )
                                        )
             Plaintiff,         )
        v.                     )                 CIVIL ACTION
                                          )                 NO. 16-10614-JGD
DAVID J. SHULKIN, Secretary of the     )
DEPARTMENT OF VETERANS AFFAIRS,  )
                                        )
             Defendant.     )


## MEMORANDUM OF DECISION AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

September 26, 2018

DEIN, U.S.M.J.

### I.  INTRODUCTION

The Plaintiff, Rosaline Bangura, has brought this action against her former employer, the

Department of Veteran Affairs, through its Secretary (collectively, the "VA"), raising a number

of claims of discrimination and retaliation in connection with her work as a Certified Nursing

Aide, and contending that she stopped going to work, and was constructively discharged, as a

result of a hostile work environment.  The VA denies any liability, and asserts that the

termination of Ms. Bangura's employment, a year after she stopped reporting to work, was due

to her failure to come to work or to follow the VA's leave policy.  This matter is before the Court

on "Defendant's Motion for Summary Judgment" (Docket No. 56) and on "Plaintiff's Request

for Entry of Summary Judgment in Her Favor."  (Docket No. 68).  In their motions, each of the

parties contends that it is entitled to judgment as a matter of law.  For the reasons detailed herein, the Defendant's motion is ALLOWED, and the Plaintiff's Motion is DENIED.

## II.  <u>STATEMENT OF FACTS</u>[1]

The following facts are undisputed unless otherwise indicated.

### <u>Plaintiff's Employment with the VA</u>

Plaintiff began working in 2007 as a Certified Nursing Aide for the VA in Bedford, Massachusetts.  (PF ¶ 5; DF ¶ 1).[2]  Plaintiff is an African American woman of Sierra Leone origin.  (PF ¶ 4).  As a Certified Nursing Aide, Plaintiff worked the evening shift of 4:00 p.m. to 12:00 a.m. and Plaintiff's job performance generally met the VA's expectations, with some exceptions.  (Id. ¶ 31; DR ¶ 82).  While at the VA, Plaintiff's nurse manager and managing official was Barbara Mueller ("Ms. Mueller"), the nurse in charge was Ann Goulet ("Ms. Goulet"), and the director of nursing in 2014 and 2015 was Mary-Ann Petrillo ("Ms. Petrillo").  (DR ¶ 6).  Plaintiff suffers from severe arthritis, high blood pressure, and other health ailments that substantially limit her

---

[1] Unless otherwise indicated, the facts are derived from Defendant's Statement of Material Facts Under L.R. 56.1 (Docket No. 55) ("DF"); exhibits attached to the Declaration of Annapurna Balakrishna in Support of Defendant's Motion for Summary Judgment (Docket No. 46) ("Def. Ex. __"); Plaintiff's Uncontested Facts in Support of Her Request for Entry of Summary Judgment Against Defendant (Docket No. 70) ("PF"); exhibits attached to the Declaration of Benneth O. Amadi in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Request for Entry of Summary Judgment in Her Favor (Docket No. 74) ("Pl. Ex. __"); and Plaintiff's Responses and Disputes to Defendant's Statement of Material Facts Under L.R. 56.1 (Docket No. 71) ("PR").  The parties also filed a Combined Statement of Material Facts (Docket No. 81) ("CSMF") for the Court's convenience, which includes the Defendant's Responses to Plaintiff's Uncontested Facts ("DR").

[2] Plaintiff contends that she had a contractual employment relationship with the VA. (PR ¶ 1). Defendant contends that the Plaintiff was appointed to her position through a Standard Form 50, and thus did not have a contract with the VA.  (DF ¶ 1).  This will be discussed <u>infra</u> in connection with Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.

ability to perform major life activities.  (PF ¶¶ 25, 73).  Plaintiff took leave under the Family and

Medical Leave Act from August 14, 2013 to January 14, 2014.  (PF ¶ 8; DR ¶ 8).

### Plaintiff's First Request for An Accommodation

In late March 2014, after Plaintiff returned from leave, she applied for a reasonable

accommodation for her disabilities.  (DF ¶ 8; PF ¶ 9).  Plaintiff submitted two medical letters to

support her request.  (Pl. Ex. D; Def. Ex. D).  The first letter, from Dr. Wen Yee Lee, dated

January 7, 2014, stated that Plaintiff "may return to work, working no more than 40

hours/week with no restrictions, on 1/20/2014."  (DF ¶ 9).  The second letter from Dr. Wen Yee

Lee, dated April 3, 2014, stated that Plaintiff suffered from osteoarthritis of both knees and

"[s]he can not work more than 8 hours per day."  (Pl. Ex. D).  Plaintiff made the doctor's advice

known to Defendant and, specifically, to Ms. Mueller, Ms. Goulet, and Ms. Petrillo.  (PF ¶ 11).

In or about April 2014, the VA granted Plaintiff's accommodation, which went into effect

on March 28, 2014.  (DF ¶ 11).[3]  The parties dispute the level of enforcement of the reasonable

accommodation.  (PF ¶ 13; DR ¶ 13).  Plaintiff asserts that her workplace became difficult

because she was forced to work more than forty hours per week or eight hours per shift and

had to stay to cover later shifts.  (PF ¶¶ 13, 15; Pl. Ex. A at 2-3).  She has offered no support for

her claim of working additional hours other than her own, generalized, statement.  Defendant

contends that the VA did not schedule Plaintiff to work more than 40 hours per week after

---

[3]  The approved request for accommodation stated:

> Not to work more than 8 hours per day and to provide rest periods during the shift, as
> needed and scheduled.  These additional rest periods may extend the tour of duty, but
> no more than 8 hours of work will be performed.  You will let the person in charge during
> your shift know that you are in need of a rest period prior to taking the rest period.

(Def. Ex. D).

January 14, 2014 and no more than eight hours per shift after April 1, 2014.  (DR ¶ 13).  The VA's assertion is supported by the Plaintiff's timecards.  (Id.).

Between May 28, 2014 and May 31, 2014, three of Plaintiff's white coworkers filled out separate "Reports of Contact" about an incident on their floor with Plaintiff on May 28, 2014.  (See Def. Ex. E).  The reports provided that Plaintiff was disruptive, loud, upset the patients, and used her phone in the patient care area.  (Id.; DF ¶¶ 13-15).  Plaintiff contends that all of these reports were false and that Ms. Mueller and Ms. Goulet convinced her coworkers to write these reports against her.  (PR ¶¶ 13-16; PF ¶ 16).[4]  Plaintiff also contends that some of these same white coworkers made fun of her accent, food, and disability.  (PR ¶ 16).[5]  All the coworkers have sworn under oath that they did not ridicule Plaintiff or write false reports against her.  (DR ¶ 97).  Plaintiff contends that this behavior contributed to creating a hostile work environment, and that the events of May 2014, as well as the hours she worked, would be evidenced on surveillance tapes from cameras on the floor where she worked.  (See Pl. Mem. (Docket No. 73) at 19 ("defendants have suppressed the production of the recordings of the surveillance cameras because their conducts are discriminatory and allegations against plaintiff, and their explanations are tissues of lies, untrue and pretextual.")).  However, the VA has attested to the

---

[4]  Although Plaintiff's counsel cites to Pl. Ex. A at 21, 23-26 in the response to DF ¶ 16, Pl. Ex. A does not reference the listed line or page numbers.  Plaintiff's counsel undoubtedly intended to cite to Pl. Ex. J, a deposition of Plaintiff conducted in connection with her Office of Resolution Management ("ORM") investigation in 2015.

[5]  See supra note 4.  Plaintiff further contends that she complained internally to Ms. Mueller about her coworkers' bullying and requested an investigation, but the VA did not take action.  (See PR ¶ 16).  Defendant disputes this and contends that Plaintiff has not identified evidence to support this statement.  (DR ¶ 61).

fact that the surveillance cameras were not installed until several years after the events at issue.  (DR ¶¶ 57-58; Docket No. 79-1).

### Plaintiff's Second Request for An Accommodation

Following the reports of the May 28, 2014 incident, nursing leadership recommended that Plaintiff change shifts and Ms. Mueller reassigned Plaintiff to work the day shift, starting on June 3, 2014 at 7:30 a.m.  (DF ¶¶ 16-17).  The parties dispute the purpose of the shift change. (DF ¶ 18; PR ¶ 18).  Plaintiff contends the purpose was retaliatory and discriminatory because Plaintiff complained about bullying and because Ms. Mueller told Plaintiff that her white coworkers did not want to work with her.  (PR ¶ 16).[6]  Defendant contends that the purpose of the shift change was to place the Plaintiff with more supervisors who could better evaluate and educate her, because there was not enough staff on the evening shift to correct employee behavior.  (DF ¶¶ 18-19).

On June 3, 2014, Plaintiff did not arrive to work her first day shift.  (Id. ¶ 21).  On June 5, 2014, Plaintiff requested that she be returned to the evening shift and reassigned to another floor.  (Id. ¶ 22; PF ¶ 24).  Plaintiff alleges that she informed the Defendant that "it would be against her health conditions to work on the morning shifts."  (PF ¶ 30).  To support her request, Plaintiff provided a letter from a physician's assistant, dated June 4, 2014, that stated, "the structure during the evening could make her less fatigued and she would be more fully functional that [sic] working during day shift."  (DF ¶ 23; Pl. Ex. E).  The VA did not grant Plaintiff's second accommodation request. (Id. ¶ 24).  Plaintiff contends that the VA's denial of

---

[6] See supra note 4.

her request for accommodation was retaliatory and discriminatory. (PF ¶ 51). Plaintiff also asserts that the Defendant threatened Plaintiff that she would be arrested if she came to work on the evening shift. (Id. ¶ 30). Defendant disputes Plaintiff's allegations and contends that the VA did not grant her request because the letter was not sufficient to support the change to the evening shift, and the shift change was intended to be temporary. (DR ¶¶ 51, 55).

Plaintiff never returned to work after June 3, 2014. (DF ¶ 26). The Plaintiff contends that she was constructively discharged as of June 8, 2014. (PF ¶ 2; PR ¶ 30). The Defendant contends that she never resigned, and was eventually terminated on July 6, 2015, effective June 26, 2015, for failing to come to work or to request leave. (DF ¶ 40).

### Plaintiff's EEO Complaints and Termination of Employment

On June 11, 2014, Plaintiff met with the Equal Employment Opportunity ("EEO") Manager at the VA, Deborah Outing ("Ms. Outing"), regarding her discrimination claims. (DF ¶ 27). According to Ms. Outing, she advised Plaintiff that she would need to contact the ORM within forty-five days of the incident to start the EEO complaint procedure. (Id. ¶ 28). Ms. Outing was the appropriate contact for the settlement of non-EEO issues only. (Id. ¶ 4). On June 24, 2014, Ms. Mueller called Plaintiff and told her "she was a VA employee who was expected to report to work unless she was requesting leave." (Id. ¶ 30). On June 25, 2014, Plaintiff submitted a complaint of discrimination to Ms. Outing at the EEO (the "June 2014 Complaint") and, according to Ms. Outing, she again explained to the Plaintiff the appropriate

process for filing complaints with the ORM.  (Id. ¶ 29).[7]  On June 27, 2014, Plaintiff also sub-

mitted a request to transfer to another ward to Ms. Mueller, copying Ms. Petrillo and a union

representative.  (Id. ¶ 31).  On the same day, the VA deemed Plaintiff to be away without leave

("AWOL").  (Id. ¶ 32).

In a letter dated July 2, 2014, the VA notified Plaintiff of a proposal to suspend her for

five days starting on August 18, 2014 for inappropriate conduct, patient abuse, using a cell-

phone in a patient area, and being AWOL.  (Id. ¶ 33).  As part of the proposal for suspension,

the VA took into account a prior incident from 2013 with a charge nurse, Wayne Baptiste ("Mr.

Baptiste"), who reported Plaintiff for raising her voice to a patient.  (Id. ¶ 5; Def. Ex. H at 5).  He

also reported that Plaintiff resisted attempts to "re-educate her on communication tech-

niques."  (DF ¶ 5).  Plaintiff asserts that the incident was falsified and that Mr. Baptiste had

taunted her.  (PF ¶ 95).  As a result of this incident, the VA issued Plaintiff an Admonishment for

her behavior.  (DF ¶ 7).[8]

On July 21, 2014, the Plaintiff having failed to return to work, the VA suspended her and

notified her of her appeal rights.  (Id. ¶ 34).  In November 2014, the VA sent a letter to Plaintiff

---

[7] Defendant also contends the VA provided Plaintiff with EEO complaint procedure training in June
2012, but Plaintiff denies she ever received the training.  (DF ¶ 2; PR ¶ 2; PF ¶ 94; DR ¶ 94).  The ORM
decision noted that the EEO Manager at the VA (Ms. Outing) had verified that the Plaintiff had received
training, and that it had included information about the EEO process and applicable time limits.  (Def. Ex.
Q at 2; see also Outling Decl. (Docket No. 53) at Ex. A; Def. Ex. B).

[8] Plaintiff asserts that the fact that Mr. Baptiste's allegations were false, and that the VA's reliance
thereon was a pretext, is evidenced by the fact that the incident would have been reflected in a
surveillance tape, and the VA did not transfer her to a different floor as Mr. Baptiste had requested.
(See Pl. Mem. at 2-3).  As noted above, however, there was no surveillance camera in the hallway at the
time.  (DR ¶¶ 57-58).  The VA contends that it elected to issue the Admonishment instead of transferring
the Plaintiff because it deemed that to be the appropriate response to the complaint about Plaintiff's
behavior.  (See DF ¶ 7).

proposing her termination because of her continued AWOL status and failure to follow leave procedures. (Id. ¶ 36).[9]

On October 16, 2014, Plaintiff had informal counseling with the ORM about her complaints of discrimination based on denied reasonable accommodation, suspension, and hostile work environment. (Id. ¶ 35). At that time she did not allege a constructive discharge, just a suspension on August 18, 2014. (Def. Ex. L). On January 12, 2015, the ORM sent Plaintiff's counsel a letter acknowledging their informal meeting and informing Plaintiff of her option to file a formal complaint of discrimination with the ORM. (Id.; DF ¶ 37). On January 26, 2015, Plaintiff filed a discrimination complaint (the "January 2015 Complaint") with the ORM. (DR ¶ 53; Def. Ex. M). She alleged discrimination, including "suspension and constructive termination" on August 18, 2014, and claimed that she had been denied reasonable accommodation on June 5, 2014, improperly suspended on August 18, 2014, and subjected to a hostile work environment between May 28, 2014 and May 31, 2014. (Id.).

On April 9, 2015, the ORM provided Plaintiff, through her counsel, with a Notice of Partial Acceptance of certain claims alleged in the January 2015 Complaint. (DF ¶ 39; Def. Ex. N). The ORM accepted part of Plaintiff's discrimination complaint under a hostile work environment claim pertaining to her allegations against her co-workers and her AWOL status between September 2, 2014 and October 17, 2014. (Id.). The ORM dismissed her accommodation claim (denial of request to remain on an eight hour-evening shift) for failure to properly initiate contact with an EEO counselor within forty-five days of the incident, but

---

[9] While not clear from the record, it appears that the VA took no further action while the Plaintiff's ORM complaint was pending.

agreed to consider the event as part of her overall hostile work environment claim. (Id.). The ORM also noted that Plaintiff's constructive discharge claim was not properly raised with an EEO counselor and that the ORM "will not be framing this matter as a constructive discharge claim." (DF ¶ 39; Def. Ex. N at 1).

Once the ORM accepts any feasible claims, it assigns those claims to an impartial investigator to obtain evidence from the complainant and compile an investigative file. (Def. Ex. N at 4). An investigator is only authorized to investigate the claims accepted by ORM. (Id.) On August 13, 2015, the Plaintiff requested leave to amend her Complaint, which was granted, to add additional claims that she was subjected to a hostile work environment based on disability, race, national origin and reprisal. (See DF ¶¶ 42-43; Def. Ex. P at 2-3). Upon completion of its investigation, the ORM issued a Final Agency Decision in February 2016. (Def. Ex. Q). The ORM found in favor of the VA on all claims, specifically finding no disparate treatment (id. at 11-12), no discrimination (id. at 13-14) and that Plaintiff's hostile environment-harassment claim "consists of only her dissatisfaction with job-related events" that did "not rise to the level of harassment as defined under federal EEO law." (Id. at 14). The Plaintiff was advised of her right to file a case in court. (Id. at 15-16).

On July 6, 2015, the VA terminated Plaintiff's employment, effective June 26, 2015. (DF ¶ 40). Plaintiff disputes the validity of the termination because she alleges she was constructively discharged on or about June 8, 2014. (PR ¶¶ 30, 40).

Additional facts will be provided below where appropriate.

### III. <u>ANALYSIS</u>

#### A.    <u>Standard of Review – Summary Judgment</u>

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>PC Interiors, Ltd. v. J. Tucci Constr. Co.</u>, 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991)) (additional citation omitted). The burden is upon the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" <u>Vineberg v. Bissonnette</u>, 548 F.3d 50, 56 (1st Cir. 2008) (quoting <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d 46, 48 (1st Cir. 1990)). "A fact is 'material' only if it possesses the capacity to sway the outcome of the litigation under the applicable law." <u>Id.</u> (quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue." <u>PC Interiors, Ltd.</u>, 794 F. Supp. 2d at 275. The opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts. <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 841-42 (1st Cir. 1993). Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a genuine issue for trial. <u>Id.</u> (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)). The court affords "no evidentiary weight to conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is

less than significantly probative."  Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (internal quotations and citation omitted).  Rather, "[w]here, as here, the nonmovant bears the burden of proof on the dispositive issue, it must point to 'competent evidence' and 'specific facts' to stave off summary judgment."  Id. (citation omitted).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).  "When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56."  Peck v. City of Boston, 750 F. Supp. 2d 308, 312 (D. Mass. 2010) (quoting Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991)).

### B.    Exhaustion of Administrative Remedies[10]

Defendant contends that Plaintiff is barred from bringing Counts I, IV, VI, and IX because Plaintiff failed to exhaust her administrative remedies by contacting an EEO counselor within forty-five days after the alleged discriminatory acts.[11]  This Court agrees in part.  While Plaintiff

---

[10]  Plaintiff argues that "Defendants are estopped from further raising any issue concerning plaintiff's exhaustion of her administrative remedies because defendants had already admitted that plaintiff exhausted her administrative remedies," citing the Defendant's response to Request for Admission ¶ 51. (Pl. Mem. at 9).  However, the response in fact says "Defendant denies that Plaintiff exhausted her administrative remedies for all of her claims in this complaint but admits Plaintiff exhausted her remedies regarding some of her claims and was issued a right to sue."  (Pl. Ex. B ¶ 51 (emphasis in original)).

[11]  Count I and IX are Plaintiff's failure to accommodate claims, Count IV is Plaintiff's disability discrimination claim, and Count VI is Plaintiff's racial and national origin discrimination claim.

satisfied the exhaustion requirement with regard to Counts IV and VI, she failed to do so with regard to Counts I and IX.

"[A] *federal employee* who brings an action under the Rehabilitation Act must exhaust administrative remedies before proceeding to court." Bartlett v. Dep't of the Treasury, 749 F.3d 1, 8 (1st Cir. 2014) (citing Spence v. Straw, 54 F.3d 196, 201 (3d Cir. 1995)) (emphasis in original). The purpose of the requirement "is to provide the employer with prompt notice of the claim and to create an opportunity for early conciliation." Fantini v. Salem State Coll., 557 F.3d 22, 26 (1st Cir. 2009). In filing a complaint in court, a plaintiff is limited to her original claims as well as those that "come within the scope of the EEOC investigation which can reasonably be expected to grow out of the [original] charge of discrimination." Id. at 27 (quotations and citations omitted).

This Court concludes that Plaintiff exhausted her remedies with regard to Counts IV (disability discrimination) and VI (racial and national origin discrimination). Based on the January 2015 Complaint, the ORM described the Plaintiff's complaint of discrimination as raising a hostile work environment discrimination claim "based on disability, race (Black), [and] national origin (African/Sierra Leone)[.]" (Def. Ex. N at ¶ 4). She did not raise independent claims of disability discrimination or racial and national origin discrimination. (See DF ¶ 38). Nevertheless, in light of the fact that Plaintiff's hostile work environment discrimination claim was sufficiently based on disability, race, and national origin, this Court will treat the direct claims as having been exhausted. "[T]he scope of the investigation rule permits a district court to look beyond the four corners of the underlying administrative charge to consider collateral and alternative bases or acts that would have been uncovered in a reasonable investigation."

Thornton v. United Parcel Service, Inc., 587 F.3d 27, 32 (1st Cir. 2009). Here, Plaintiff's disability and racial and national origin discrimination claims are reasonably related to Plaintiff's original hostile work environment claim based on disability, race, and national origin and should have alerted the ORM to those claims of discrimination "regardless of whether [those direct claims were] actually investigated." Id. (citing Davis v. Lucent Techs., Inc., 251 F.3d 227, 233 (1st Cir. 2001). Thus, Plaintiff has satisfied the exhaustion requirement for her disability discrimination claim (Count IV) and her racial and national origin discrimination claim (Count VI).

Plaintiff did not properly exhaust her remedies with regard to Counts I and IX (failure to accommodate under the ADA and Rehabilitation Act, respectively), and these claims were deemed untimely by ORM. (Def. Ex. N at ¶¶ 4(1) & 5). In order to exhaust administrative remedies, an employee must contact an EEO counselor within forty-five days of the alleged discriminatory act to attempt an initial informal resolution of the matter. Velazquez-Rivera v. Danzig, 234 F.3d 790, 794 (1st Cir. 2000); 29 C.F.R. § 1614.105(a)(1). Failure to do so serves as a bar to bringing a claim in court. Velazquez, 234 F.3d at 794. In the instant case, Plaintiff argues that she exhausted her failure to accommodate claims because her June 2014 Complaint sub-mitted to Ms. Outing sufficiently began the process to file an EEO discrimination complaint. (Pl. Mem. at 9-10). Then she argues that "the EEO manager or counselor failed to act timely. Plain-tiff therefore [should] not be made to bear the responsibility for the counselor's negligence, failure to act or failure to act in a timely manner." (Id. at 9). However, the record is clear that Ms. Outing is not an EEO counselor but merely the internal contact at the VA for settlement of non-EEO issues. (DF ¶ 4). Plaintiff did not speak with ORM until October 2014, and did not file a complaint until January 2015. ORM dismissed her accommodation claims from her January

2015 Complaint for failure to comply with the statutory time limits.  (DF ¶¶ 35, 39; Def. Ex. N at 2).  This Court agrees that in failing to properly file within the mandatory time frame, Plaintiff did not exhaust her administrative remedies for her current accommodation claims (Counts I and IX).  Moreover, Plaintiff's accommodation claims are "beyond the bounds and parameters encompassed by [Plaintiff's January 2015] administrative charge."  Thornton, 587 F.3d at 32.  The January 2015 Complaint alleged a hostile work environment claim.  Plaintiff's accommodation claims before this Court do not reasonably grow out of a hostile work environment claim.  The two claims are of different types.  See Lattimore v. Polaroid Corp., 99 F.3d 456, 463 (1st Cir. 1996) (hostile environment claim "is readily distinguishable from 'job status' discrimination . . . that occurs when action is taken that adversely affects an employee's job status[.]"  "A job status discrimination claim is not converted into a harassment claim simply because it is labeled as such.").  As a result, Plaintiff did not properly exhaust her administrative remedies for Counts I and IX.

Plaintiff argues alternatively that this Court should equitably toll the forty-five day limitation on her claims.  This Court does not agree.  The exhaustion of remedies requirement "is not a jurisdictional prerequisite to suit in federal court, but a requirement that . . . is subject to waiver, estoppel, and equitable tolling."  Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 102 S. Ct. 1127, 1132, 71 L. Ed. 2d 234 (1982).  The First Circuit has taken a "narrow view" of exhaustion requirements and equitable tolling is not intended to protect a plaintiff who fails to exercise due diligence.  Frederique-Alexandre v. Dep't of Natural & Envtl. Res., 478 F.3d 433, 440 (1st Cir. 2007) (quoting Mack v. Great Atl. & Pac. Tea Co., Inc., 871 F.2d 179, 185 (1st Cir. 1989)).  Equitable tolling requires exceptional circumstances and a "heavy burden of proving

entitlement to equitable relief lies with the complainant." Bartlett, 749 F.3d at 10 (internal quotation omitted). "[O]rdinarily there cannot be equitable tolling based on excusable ignorance if the plaintiff had *either* actual or constructive knowledge of her statutory rights." Id. at 11 (citation omitted) (emphasis in original). Moreover, "[a]ctual knowledge occurs where an employee either learns or is told of [her] rights, even if [she] becomes only *generally aware* of the fact that there is a statute . . . providing relief . . . ." Id. at 10 (quoting Kale v. Combined Ins. Co. of Am., 861 F.2d 746, 753 (1st Cir. 1988)) (emphasis added).

Plaintiff maintains that she was not aware of the proper ORM complaint procedure, did not receive the training provided by the VA, and denies that Ms. Outing informed her of a need to file a complaint with the ORM. (See PR ¶¶ 2, 28-29). However, Plaintiff does not put forth significantly probative evidence to carry her heavy burden of proving entitlement to equitable relief. As an initial matter, Ms. Outing's version of events is reflected in contemporaneous records. (See Outing Decl. (Docket 53) at Ex. A (describing file); Balakrishna Decl. (Docket No. 46) at ¶ 4; Def. Ex. B (attendance records)). However, Plaintiff has no evidence to support her denial. Furthermore, as the ORM described in its Notice of Partial Acceptance of April 9, 2015, it was clearly not within Ms. Outing's authority to initiate an EEO complaint. (Def. Ex. N at 2-3). As ORM wrote to Plaintiff's counsel explaining its finding that the denial of accommodation request was untimely, and declining the request for tolling:

> Your client explained that she believed that her June 2014 contact with the facility EEO manager, Deborah Outing, constituted her initial contact to contact an EEO counselor. Ms. Outing provided documentation that the complainant contacted her on two occasions in June 2014 and that on both occasions Ms. Outing explained the process to file an EEO complaint, informed her that she could not process complaints and provided her the [ORM] brochure. Since the inception of ORM in 1997, ORM removed the responsibility for processing EEO complaints from individual facility EEO

> Program Managers, and centralized the responsebility under ORM. Because
> of this reorganization, the facility EEO Program Managers are not "logically
> connected" to the EEO complaint process; and, therefore, their only obliga-
> tion is to properly advise a prospective complainant on how to exercise their
> EEO rights, including who to contact, which, within VA, is ORM. The agency
> further provided employee training records indicating that your client
> received training on the process and regulatory time lines with the ORM toll
> free phone number.

(Id.). Plaintiff has not put forth any facts which would support a conclusion that Ms. Outing did

not fulfill her job responsibilities (which had been in effect since 1997) and inform the Plaintiff

of the need to file an appropriate complaint.

The ORM agreed to consider Plaintiff's claim of failure to accommodate as part of her

hostile work environment claim. (Id. at 3). This Court will do the same. Therefore, the Plaintiff

will not be prejudiced by adherence to the notice period, and the Defendant will still have to

address the merits of its decision not to allow the Plaintiff to move to the evening shift on

another floor. Since the direct claims of failure to accommodate are not exhausted, Defen-

dant's motion for summary judgment on Counts I and IX is granted and Plaintiff's motion for

summary judgment on those Counts is denied.

### C.  Count III: Constructive Discharge

In Count III of her Complaint, Plaintiff alleges that she was constructively discharged

from her employment. As she has made clear in her summary judgment record, she sets the

date for such discharge at June 8, 2014. This claim is the crux of Plaintiff's case. If she was

constructively discharged in June 2014, then her failure to appear at work for the next year

prior to the VA's termination of her employment effective June 26, 2015 is excused. (See Pl.

Mem. at 8 ("Plaintiff was forced to quit her job about June 8, 2018 [sic], because of the hostile

work environment created by the defendants. The AWOLs and the other things thereafter,

were pretextuals and further acts of harassments and intimidations by defendants against plaintiff.")).  If, however, she was not constructively discharged at that time, the VA clearly had grounds to terminate her employment after she was absent from work for a year.  For the reasons detailed herein, the VA is entitled to summary judgment on this constructive discharge claim.  Not only did the Plaintiff fail to exhaust her administrative remedies as to this claim, but the claim fails on the merits as a matter of law based on the undisputed facts.

### Failure to Exhaust

As an initial matter, the record is clear that any claim for constructive discharge in June 2014 was not exhausted.  Even if this Court assumes the June 2014 Complaint was sufficient to start her complaint process, Plaintiff failed to mention a constructive discharge claim at that time.  (Pl. Ex. A).  In her informal counseling with ORM, Plaintiff only referred to a "disciplinary action-suspension" which she dated as August 18, 2014.  (Def. Ex. L).  In her January 2015 Complaint, Plaintiff mentions constructive discharge for the first time, but again sets the date as August 18, 2014.  (Def. Ex. M).  ORM did not consider any constructive discharge claim as part of its investigation because the claim had not been properly raised with an EEO counselor.[12] (Id. ¶¶ 38-39).  Thus, it is clear that any claim of constructive discharge, and especially one that was based on events in June 2014, was not exhausted.  Moreover, there is no basis for tolling since there are no facts proffered that would explain why the claim of constructive discharge was not mentioned even in the informal ORM process, and why the June date was never raised.

---

[12]  Additionally, for the reasons detailed above, Plaintiff's constructive discharge claim relates solely to an alleged employment decision made by the VA and cannot reasonably be construed to be within the scope of investigation of a hostile work environment claim.  See Lattimore, 99 F.3d at 463 (hostile work environment claim substantively different than claim of change of status).

For this reason alone, Defendant's motion for summary judgment on Count III is allowed, and Plaintiff's motion as to Count III is denied.

Defendant also argues that the claim of constructive discharge in June 2014 cannot stand because Plaintiff did not resign from her employment. "[A] constructive discharge claim requires two basic allegations: discriminatory conduct by the employer that leads to resignation of the employee." Green v. Brennan, 136 S. Ct. 1769, 1777-78, 195 L. Ed. 2d 44 (2016). See also Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 160 n.18 (1st Cir. 2009) (resignation necessary element of constructive discharge claim). Plaintiff's status as of June 8, 2014 is ambiguous at best. While it is undisputed that she did not return to work after June 3, 2014, the Defendant contends that she continued to be employed after that, although she was AWOL from her job. While Plaintiff contends that she was forced out of her job as of June 8, 2014, she nevertheless complained to ORM about her suspension on August 18, 2014, thereby indicating that she still believed herself to be employed as of that date. Given the ambiguity of the record, this Court will not base its summary judgment decision regarding Count III on whether or not the Plaintiff resigned as of June 8, 2014.

### Merits of Constructive Discharge Claim

The Plaintiff has moved for summary judgment on the merits of her constructive discharge claim, arguing that the facts compel the conclusion that she was forced to resign. (Pl. Mem. at 16-18). While the Defendant has not directly addressed whether the complained of conduct rises to the level of constructive discharge, it has addressed the same facts in the context of Count V, Plaintiff's claim of hostile work environment. (Def. Mem. (Docket No. 57) at 14-16). For the reasons detailed herein, the undisputed facts fail to establish that the Plaintiff

was constructively discharged on June 8, 2014. For this reason as well, summary judgment in favor of the Defendant, and against the Plaintiff, will enter on Count III.

Plaintiff contends that she was constructively discharged as a result of the hostile work environment she was forced to endure. (Pl. Mem. at 16-17). To establish an actionable hostile work environment "the offending behavior must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Penn. State Police v. Suders, 542 U.S. 129, 146-47, 124 S. Ct. 2342, 2354, 159 L. Ed. 2d 204 (2004) (internal quotations and citation omitted). "The harassment must be both objectively and subjectively offensive." Vega-Colon v. Wyeth Pharm., 625 F.3d 22, 32 (1st Cir. 2010). While the inquiry in each case is fact specific, summary judgment may be appropriate if the plaintiff "has failed to establish even a baseline claim of an abusive working environment." Id. at 32-33 (citation and quotation omitted). As discussed in more detail infra, the Plaintiff has failed to meet her burden to establish this claim.

To establish a "hostile-environment constructive discharge claim" the plaintiff must meet an even higher standard. "A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Penn. State Police, 542 U.S. at 147, 124 S. Ct. at 2354. The "harassment so intolerable as to cause a resignation may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts." Id. at 148, 124 S. Ct. at 2355. In the instant case, Plaintiff contends that she was subjected to harassment by her co-workers, who then made false complaints about her work performance. Even assuming her assessment of the situation is accurate (despite the lack of any record support other than her own beliefs), the Plaintiff has failed to

establish that she had no choice but to resign.  The Defendant proposed to move the Plaintiff to the day shift where there would be more supervision and she would have been away from her harassing co-workers.[13]  This proposal by the employer did not create a situation "so intolerable that a reasonable person in [Ms. Bangura's] place would feel forced to resign as opposed to stay on the job while seeking redress."  Gerald v. Univ. of P.R., 707 F.3d 7, 26 (1st Cir. 2013) (summary judgment on constructive discharge claim in favor of employer affirmed despite evidence that employee suffered a change in job title and reassignment to another work location).

Plaintiff contends that the move to the day shift was dangerous to her health, and supported her claim of a hostile work environment.  However, there is simply no way to read the letter she provided as supporting that claim.  As noted above, Plaintiff provided a letter from a physician's assistant stating that "the structure during the evening could make her less fatigued, and she would be more fully functional that [sic] working during day shift."  (DF ¶ 23; Pl. Ex. E).  The fact that the Plaintiff might be less tired if she worked nights is not sufficient to show that she had to quit her job once her shift was changed.  Although Plaintiff "may have subjectively believed that [the change in shift] created intolerable working conditions," the proposed transfer "does not support a claim that an objectively reasonable person in [her] position would have felt compelled to resign."  Whitaker v. Keypoint Gov't Sols., Inc., No. 16-cv-11329-IT, 2018 WL 401528, at *3  (D. Mass. Jan. 12, 2018) (internal quotation and citation omitted).  The Defendant is entitled to summary judgment on the merits of Plaintiff's claim of constructive discharge.

---

[13]  There is also evidence in the record that the Plaintiff would not even come in to work to discuss the shift change with Ms. Mueller.  (See Mueller Decl. (Docket No. 52) at ¶ 20).

**D.**     <u>Count IV: Disability Discrimination</u>

Count IV of the Complaint is entitled "Disability Discrimination/Disparate Treatment Based on Disability." Therein, the Plaintiff contends that "the defendants took adverse action against her because of her disability" although the purported adverse action is not clearly defined. (<u>See</u> Compl. (Docket No. 11) at ¶ 36). In her Memorandum, Plaintiff argues that she was "constructively discharged and that she was also discriminated and retaliated against based on her request for reasonable accommodation to work in the evening shift. Defendants' reasons and explanations are mere pretexts." (Pl. Mem. at 18). For the reasons detailed herein, Defendant is entitled to summary judgment on this claim as well.

The Rehabilitation Act prohibits the VA from discriminating against its employees on the basis of disability. 29 U.S.C. § 701 <u>et seq.</u>[14] As Plaintiff does not provide direct evidence of disability discrimination, Plaintiff's claim is subject to the "three-stage burden shifting frame-work of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." <u>Boadi v. Ctr. for Human Dev., Inc.</u>, 239 F. Supp. 3d 333, 349-50 (D. Mass. 2017) (quoting <u>Acevedo-Parrilla v. Novartis Ex-Lax, Inc.</u>, 696 F.3d 128, 138 (1st Cir. 2012); and citing <u>Moebius v. Tharperobbins Co.</u>, Civil Action No. 15-10751-MBB, 2016 WL 6476941, at *8 (D. Mass. Nov. 1, 2016)).

As the court in <u>Boadi</u> explained, pursuant to the <u>McDonnell Douglas</u> framework:

> Plaintiff has the initial burden to establish a prima facie case under this framework. *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S. Ct. 1817. "The rather minimal showing functions to raise an inference of discrimi-nation." *Moebius*, 2016 WL 6476941, at *8 (citing *Tex. Dep't of Cmty.*

---

[14] It is unclear from the Complaint whether the Plaintiff is also proceeding under the Americans with Disabilities Act, 42 U.S.C. § 12112(a). The analysis is the same.

> *Affairs v. Burdine*, 450 U.S. 248, 253-54, 101 S. Ct. 1089, 67 L. Ed. 2d 207
> (1981)).  If Plaintiff establishes the inference, the burden shifts to Defen-
> dant[] "to articulate a legitimate, non-discriminatory reason for its action."
> *Ramos–Echevarría v. Pichis, Inc.*, 659 F.3d 182, 186-87 (1st Cir. 2011) (citing
> *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 99 (1st Cir. 2007));
> *see also McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S. Ct. 1817.  "If the
> employer offers a non-discriminatory reason, the burden then shifts back
> to the plaintiff to show that the employer's justification is mere pretext
> cloaking discriminatory animus."  *Ramos–Echevarría*, 659 F.3d at 187 (citing
> *Freadman*, 484 F.3d at 99).

Id. at 350.

Under the McDonnell Douglas test, Plaintiff must first make out a prima facie case of disability discrimination.  To make out a prima facie case of disability discrimination, the Plaintiff must prove by a preponderance of the evidence that: (1) she was disabled within the meaning of the statute; (2) she was qualified to perform the essential functions of her job, either with or without a reasonable accommodation; and (3 ) that the VA took adverse action against her because of her disability.  Rios-Jimenez v. Principi, 520 F.3d 31, 41 (1st Cir. 2008). "[A] plaintiff's ability to survive summary judgment depends on [her] ability to muster facts sufficient to support an inference of discrimination."  Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 66 (1st Cir. 2008).  "[She] cannot rely exclusively on naked assertions, unsupported conclusions, or optimistic surmise . . . the evidence adduced on each of the elements of the asserted cause of action must be significantly probative."  Id.

As to Plaintiff's first request for reasonable accommodation, there is no evidence in the record to suggest the VA took adverse action against her "because of the disability." Rio-Jimenez, 520 F.3d at 41.  Plaintiff's first request for accommodation was granted but Plaintiff asserts that  her management officials allegedly ignored her doctor's advice and forced her to work extra hours, "especially when any employee on the mid-night shift called out."  (PF ¶ 13).

As an initial matter, this claim is defeated by her time sheets, which establish that the Plaintiff did not work more than eight hours per shift after she returned from leave in January 2014. (DF ¶ 46; DR ¶ 13).[15] Moreover, the record is devoid of any evidence that any action taken by the VA in connection with her hours was because of her disability.

Plaintiff also contends that the VA denied her second request for accommodation and, thus, "constructively discharged [her] because it was extremely medically hard, if not impossible, for Plaintiff to work on the morning shift because of her health condition." (PF ¶ 33). As detailed above, Plaintiff has failed to establish her constructive discharge claim. Even assuming, however, that Plaintiff satisfied her prima facie burden, the VA has put forth non-discriminatory reasons for her denied accommodation — the fact that the physician assistant's letter was not sufficient to warrant approval, and that the shift change was a temporary placement to provide Plaintiff educational opportunities. (DR ¶¶ 33, 51; DF ¶¶ 18-19, 24). As noted above, objectively the physician assistant's letter did not indicate that a shift change was medically necessary. Nor has Plaintiff disproved in any way that there was more supervision on the day shift. She has not put forth any facts which would support a finding "that the employer's proffered reason is pretextual and that the actual reason for the adverse employment action is discriminatory." Johnson v. Univ. of P.R., 714 F.3d 48, 54 (1st Cir. 2013).

Plaintiff maintains that Defendant had a policy in their handbook of acknowledging receipt of requests for accommodation in writing and that the Defendant's failure to follow

---

[15] This situation differs significantly from Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 144-145, 120 S. Ct. 2097, 2107, 147 L. Ed. 2d 105 (2000), on which Plaintiff relies. There the employee put forth detailed evidence explaining and supporting his contention that he had properly maintained attendance records. In contrast, in the instant case the Plaintiff makes repeated, unsubstantiated denials of the Defendant's facts, without any facts to support her claims.

their policy with regard to Plaintiff's request to transfer to the evening shift is evidence of pretext. (Pl. Mem. at 7). This Court disagrees. "[P]retext 'means more than an unusual act; it means something worse than business error; pretext means deceit used to cover one's tracks.'" Kouvchinov, 537 F.3d at 67 (quoting Ronda-Perez v. Banco Bilbao Vizcaya Argentaria, 404 F.3d 42, 45 (1st Cir. 2005)). Plaintiff has failed to provide any evidence that any failure on the part of the Defendant to follow its policy was something worse than a business error. Moreover, Plaintiff's unsupported speculation is not a substitute for sufficiently probative evidence to suggest Defendant's failure to provide a written acknowledgement was a purposefully deceitful means to cover up hidden motives. Thus, Plaintiff has failed to establish that there is a viable issue of disability discrimination to bring before a trier of fact.

### E.  Count VI: Racial and National Origin Discrimination

In Count VI of her Complaint, Plaintiff alleges that she was subject "to disparate treatment because of her color, race and national origin[,]" that "she suffered adverse employment action" and that "there is some evidence of a causal connection between her membership of a protected class and termination and/or the adverse employment action." (Compl. at ¶¶ 45-46). For all the reasons described above, the Defendant is entitled to summary judgment on this claim as well.

Employment discrimination cases alleging racial and national origin discrimination also proceed under the three stage, burden-shifting framework outlined in McDonnell Douglas. As an initial matter, while Plaintiff contends that she was "treated differently from similarly situated white employees[,]" she has not identified any comparators or otherwise defined her claim. (See Compl. ¶ 20). To the extent that the alleged adverse employment action was the

purported constructive discharge, the alleged failure to comply with the limitations on her hours and/or the refusal to keep her on the evening shift, there is no evidence that the VA's stated reasons for its actions were pretext for race or national origin discrimination.  Ruiz v. Posadas de San Juan Assocs., 124 F.3d 243, 248 (1st Cir. 1997) ("[Plaintiff] must do more than cast doubt on the rationale proffered by the employer . . . .").

Plaintiff asserts that her white coworkers and management officials falsely accused her of disruptive conduct and that there were surveillance cameras with footage Defendant deliberately failed to produce which would prove her case.  (See PF ¶¶ 57-58).  However, Defendant has provided evidence that there were no surveillance cameras in the Plaintiff's unit at that time.  (DR ¶¶ 57-58; Docket No. 79-1).  Plaintiff provides no evidence from which a factfinder could reasonably infer that unlawful discrimination was a determinative factor in any alleged adverse employment action. "[B]elief is not enough to show pretext or animus."  Roman v. Potter, 604 F.3d 34, 40 (1st Cir. 2010).  "[T]he evidence must be of such strength and quality as to permit a reasonable finding that the [adverse action] was *obviously' or 'manifestly'* unsupported."  Brown v. Trs. of Boston Univ., 891 F.2d 337, 346 (1st Cir. 1989) (emphasis added).

Finally, this Court recognizes that Plaintiff believes that comments allegedly made about her accent and food (which are disputed) are linked to and evidence of racial and national origin discrimination resulting in adverse employment action.  Even assuming this leap can be made, "[t]he question on summary judgment is whether the slight suggestion of pretext present here, absent other evidence from which discrimination can be inferred, meets plaintiff's ultimate burden."  Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 47 (1st Cir. 2002).

In the instant case, "it cannot." Id.  The record is devoid of any evidence to support Plaintiff's theory that Mr. Baptiste in 2013, and her co-workers and supervisor in 2014, all conspired to fabricate similar charges of inappropriate conduct by Plaintiff toward patients.  Moreover, given the opportunity to exhibit contrary behavior, and work during the day under more and different supervision, the Plaintiff elected not to come back to work at all.  Her claim of constructive discharge is a moving target, being raised late in the EEO process and asserting a different onset date than her present claim.  Her claim of discrimination based on requiring her to work the day shift is defeated by her physician assistant's note, which did not purport to state that the change in hours was detrimental to her health.  Where, as here, the plaintiff creates "(at best) a weak issue of fact as to pretext on the face of strong independent evidence that no discrimination occurred" "the employer is entitled to judgment as a matter of law." Id. at 47-48.

      **F.**      **Count V: Hostile Work Environment**

As detailed above, to succeed on a hostile work environment claim, a plaintiff must show that her "workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." Quiles-Quiles v. Henderson, 439 F.3d 1, 7 (1st Cir. 2006) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993)).  The court looks at all the circumstances, including, among other things, "the frequency and severity of the discriminatory conduct, whether it was physically threatening or humiliating, and whether it unreasonably interfered with [her] work performance." Kosereis v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003); see also Harris, 510 U.S. at 23, 114 S. Ct. at 371.  The First Circuit has warned that "the hostile work environment standard must be kept 'sufficiently

demanding to ensure that Title VII does not become a general civility code.'" O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283-84, 141 L. Ed. 2d 662 (1998)) (additional quotation omitted). However, "[c]ourts are supposed to use common sense, and an appropriate sensitivity to social context, to distinguish between such innocuous behavior and severely hostile or abusive conduct." Kosereis, 331 F.3d at 216 (citation omitted).

Defendant argues that Plaintiff's claims of hostile work environment do not rise to the level of sufficiently severe or pervasive conduct. This Court agrees. Plaintiff claims that after she returned from her leave (1) her management officials "instigated harassing, intimidating and humiliating conducts" that caused her white co-workers to turn against her with hostility, and write false reports against her; (2) her accent and manner of speaking were targeted, and when plaintiff ate, her coworkers used their hands "to close their noses as if plaintiff's native food was stinking[;]" and (3) Defendant knew that working the day shift would be "against [her] health and medical conditions" but forced her to work that shift and threatened arrest if she came to work on the evening shift. (PF ¶¶ 16, 19-20, 30). Plaintiff also argues that in 2013, her coworker, Mr. Baptiste, taunted and ridiculed her because of her disability. (Id. ¶ 95).

As detailed above, the record is remarkably devoid of any evidence to support the Plaintiff's allegations. Moreover, even assuming that the complained of conduct occurred, there is no evidence linking the actions to any protected status. See Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 318 (1st Cir. 2016) (absent evidence that plaintiff was subjected to any of the complained of actions because of his race, other than his own belief that that was the case, summary judgment affirmed in favor of employer); Douglas v. J.C. Penney Co., Inc., 474 F.3d 10,

15 (1st Cir. 2007) ("To establish a prima facie case for a hostile work environment claim, a plaintiff must prove" that the harassment was based upon a protected status). Finally, the evidence is insufficient to establish that the complained of conduct rises to the level of "severe or persuasive conduct" that is required to sustain a hostile work environment claim. Kosereis, 331 F.3d at 216. "A hostile work environment generally is not created by a mere offensive utterance, nor does it arise from simple teasing, offhand comments, and isolated incidents." Id. (quotations and citations omitted). Similarly, where, as here, the conduct complained of was not severe, or physically threatening, or overtly offensive, did not affect work performance, and consists only of "a litany of petty insults, vindictive behavior, and angry recriminations" summary judgment is appropriately granted to the employer. Bhatti v. Trs. of Boston Univ., 659 F.3d at 74; see also Vega-Colon, 625 F.3d at 32 (while record establishes name calling and derogative comments, "behavior was not severe, physically threatening, or humiliating" and plaintiff "failed to set forth sufficient evidence from which a jury could conclude that the complained of conduct interfered with his work performance to an extent that is unreasonable or that altered the conditions of his employment"). This Court is mindful that "[t]he accumulated effect of incidents" can amount to a hostile work environment over time, and that the court is to consider the evidence under a totality of the circumstances. O'Rourke, 235 F.3d at 729. Nevertheless, considering the evidence as a whole, the Plaintiff has failed to establish a triable claim of a discriminatory hostile work environment. Defendant's motion for summary judgment on Count V is allowed and Plaintiff's motion for summary judgment on that Count is denied.

**G.      Count II: Retaliation**

In Count II of her Complaint, Plaintiff purports to bring claims of retaliation under Title VII and the Rehabilitation Act.  Plaintiff's retaliation claims are subject to the burden shifting framework articulated above in McDonnell Douglas.  To establish a prima facie case of retaliation, a plaintiff must prove that: (1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity.  Fantini, 557 F.3d at 32.  "For a retaliation claim to survive a motion for summary judgment, the plaintiff must point to evidence in the record that would permit a rational factfinder to conclude that the employment action was retaliatory."  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 57 (1st Cir. 2000) (internal quotation omitted).

Plaintiff alleges that she engaged in several instances of protected activity.  First, Plaintiff contends she reported her coworkers' "illegal conduct" of making fun of her accent, food, and disability to management personnel and subsequently suffered an arbitrary shift change in retaliation.  (PF ¶¶ 19-20, 28-29).  Plaintiff has failed to provide any evidence that she reported the conduct at that time, but even if she did report it and this Court deemed that action protected activity (which is questionable), the VA provided a legitimate business reason for the shift change.  The VA provides that it wanted to place Plaintiff with more supervisors that could better evaluate and educate her.  (DF ¶¶ 18-19).  This shifts the burden back to the  Plaintiff to establish pretext.

Like in connection with other claims, Plaintiff's only "evidence" of pretext is a speculative assertion that the VA had surveillance cameras and that the Defendant refuses to hand over any recordings.  (PF ¶¶ 57-58).  However, Defendant responded to interrogatories under

oath that there were no surveillance cameras at the relevant time. (DR ¶¶ 57-58). Thus, Plaintiff has not pointed to any probative evidence in the record to suggest pretext and that the adverse action was motivated by Defendant's retaliatory animus. <u>Calero-Cerezo v. U.S. Dep't of Justice</u>, 355 F.3d 6, 26 (1st Cir. 2004).

Plaintiff also contends that her second request for reasonable accommodation to switch shifts is protected activity and the denial of that accommodation caused her to be terminated. For the purpose of summary judgment, Defendant admits that a request for reasonable accommodation is protected activity, and that suspending and terminating Plaintiff as well as changing Plaintiff's shift would be considered an adverse employment action. (DR ¶¶ 53-54, 60). As pled, the Plaintiff alleges that there was a causal connection between her protected activity and her subsequent termination. (<u>See</u> Compl. ¶ 30). It is unclear whether the referenced "termination" is the VA's action terminating Plaintiff's employment effective on June 26, 2015 or Plaintiff's alleged claim of constructive discharge on June 8, 2014. In either case, the VA is entitled to summary judgment on this claim.

The Plaintiff has not put forth any evidence establishing that the VA's termination of Plaintiff's employment in 2015 was causally connected either to her complaints about her co-workers or to her denied request for a shift change in June 2014. As an initial matter, the time period is too long between the Plaintiff's conduct and the termination to imply causation. The Supreme Court has stated that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close[.]'" <u>Clark Cty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273-74, 121 S. Ct. 1508,

1511, 149 L. Ed. 2d 509 (2001) (citation omitted).  Three and four month periods have been

held insufficient to establish a causal connection based on temporal proximity.  <u>Calero-Cerezo</u>,

355 F.3d at 25.  Here, the fact that a year passed between the allegedly protected conduct and

the VA's termination of her employment in 2015 defeats Plaintiff's contention that the two are

causally related.

Even assuming, however, that Plaintiff could make out a prima facie case that her

protected conduct led to her constructive discharge on June 8, 2014, summary judgment for

the Defendant would still be appropriate.  The Plaintiff has presented no evidence to rebut

Defendant's legitimate, non-discriminatory reason for the change in Plaintiff's schedule which

purportedly led to her constructive discharge.  As detailed above, the Plaintiff's letter did not

mandate a night shift for health reasons, and the Plaintiff has not refuted Defendant's conten-

tion that the day shift offered more opportunities for supervision and education.  (DR ¶ 51; DF

¶¶ 18-19, 23-24).

In response, Plaintiff offers no evidence to rebut those reasons except for her allega-

tions that the VA did not follow their policies in evaluating her request for accommodation and

her assertion that the VA's "explanations are tissues of lies, untrue and pretextual."  (Pl. Mem.

at 19).  As discussed above, this Court does not agree that the VA's failure to follow its policies

proves pretext.  Additionally, "[i]t is not enough for [Plaintiff] merely to impugn the veracity of

the employer's justification; [she] must elucidate specific facts which would enable a jury to

find that the reason given is not only a sham, but a sham intended to cover up the employer's

real motive . . . ."  <u>Melendez v. Autogermana, Inc.</u>, 622 F.3d 46, 52 (1st Cir. 2010) (quotations

and citations omitted).  "Absent evidence rebutting defendant's legitimate, non-discriminatory

reason for its action, summary judgment is appropriate." <u>Armery v. Potter</u>, 497 F. Supp. 2d 134, 142 (D. Mass. 2007) (footnote omitted).  For these reasons, Defendant's motion for summary judgment on Count II is granted and Plaintiff's motion for summary judgment on this Count is denied.

### H. Count VII: Intentional Infliction of Emotional Distress

Defendant asserts that Plaintiff's claim for intentional infliction of emotional distress in Count VII of her Complaint fails because the claim is preempted by federal law.  This Court agrees.  Federal statutes, including Title VII and the Rehabilitation Act, provide the exclusive judicial remedies for discrimination claims in federal employment.  <u>See</u> <u>Brown v. Gen. Servs. Admin.</u>, 425 U.S. 820, 835, 96 S. Ct. 1961, 1969, 48 L. Ed. 2d 402 (1976); <u>see</u> <u>also</u> <u>Stoll v. Principi</u>, No. 02-cv-2761-JAG, 2005 WL 4542884, at *4-5 (D.P.R. Aug. 2, 2005) (explaining that the Reha-bilitation Act is the exclusive remedy for a federal employee's disability discrimination allega-tion).  "When a complainant against a federal employer relies on the same facts to establish a Title VII claim and a non-Title VII claim, the non-Title VII claim is not sufficiently distinct to avoid preemption."  <u>Pfau v. Reed</u>, 125 F.3d 927, 932 (5th Cir. 1997), <u>vacated</u> <u>and</u> <u>remanded</u> <u>on</u> <u>other</u> <u>grounds</u>, 525 U.S. 801, 119 S. Ct. 32, 142 L. Ed. 2d 24 (1998), <u>holding</u> <u>reinstated</u> <u>in</u> <u>relevant</u> <u>part</u>, 167 F.3d 228, 229 (5th Cir. 1999) (quotation and citation omitted).  Similarly, the First Circuit has acknowledged that "where the gravamen of the claim is Title VII discrimination, the only remedy available is under Title VII."  <u>Rivera-Rosario v. U.S. Dep't of Agric.</u>, 151 F.3d 34, 38 (1st Cir. 1998).

Here, Plaintiff's claim of intentional infliction of emotional distress arises out of the same conduct that forms the basis of her alleged employment discrimination claims.  Plaintiff

does not cite to facts or advance instances of conduct in support of her intentional infliction of emotional distress claim that differ from her Title VII and Rehabilitation Act claims. (PF ¶¶ 84-85). Where, as here, the claim of intentional infliction of emotional distress is "wholly deriva-tive from the alleged conduct giving rise to her Title VII" and Rehabilitation Act claims, the tort claim has been preempted. Roland v. Potter, 366 F. Supp. 2d 1233, 1236 (S.D. Ga. 2005). For this reason, this Court finds as a matter of law that Title VII and the Rehabilitation Act provide Plaintiff the sole remedy for her claims and Defendant's motion for summary judgment on Count VII is granted and Plaintiff's motion for summary judgment on that Count is denied.

I.    **Count VIII: Violation of Good Faith and Fair Dealing in Employment And Contractual Relations**

In Count VIII of her Complaint, Plaintiff alleges breach of the covenant of good faith and fair dealing in employment and contractual relations due to defendants' "discriminations, retaliations, infliction of emotional distress, hostile work environment and other unlawful conducts against plaintiff[.]" (Compl. ¶ 52). This Count fails for a number of reasons.

As an initial matter, "without a contract, there is no covenant to be breached." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 230 (1st Cir. 2005). Despite her denial, Defendant has established that the Plaintiff was appointed by a Standard Form 50 Notification of Personnel Action dated July 8, 2007. (DF ¶ 1). Courts have consistently recog-nized that, as a general rule, "federal employees derive their rights by appointment and not by contract[.]" Refaei v. United States, 129 Fed. Cl. 1, 12-15 (Fed. Cl. Oct. 25, 2016). Therefore, this claim must fail.

Moreover, this claim is also preempted by federal law for the same reasons as the Plain-tiff's claim of intentional infliction of emotional distress — her claim of breach of the implied

covenant of good faith is based on the same conduct as forms her discrimination claims under Title VII and the Rehabilitation Act.

Finally, this claim must fail because this Court does not have jurisdiction to hear this claim. "The objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." Arbaugh v. Y&H Corp., 546 U.S. 500, 506, 126 S. Ct. 1235, 1240, 163 L. Ed. 2d 1097 (2006). Under the Tucker Act, federal district courts have original jurisdiction, concurrent with the Court of Federal Claims, over any "civil action or claim against the United States, not exceeding $10,000 in amount, founded . . . upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort . . . ." 28 U.S.C. § 1346(a)(2). Thus, the Court of Federal Claims retains *exclusive* jurisdiction over all contract claims against the United States seeking more than $10,000. Plaintiff demands $300,000 in damages in every Count of her Complaint. This exceeds the $10,000 amount dictated under the Tucker Act and as a result, the Court of Federal Claims possesses exclusive jurisdiction over this claim. For this reason, Defendant is entitled to judgment as a matter of law with respect to Count VIII and Plaintiff's motion for summary judgment on this Count is denied.

## IV. CONCLUSION

For the reasons detailed herein, "Defendant's Motion for Summary Judgment" (Docket No. 56) is ALLOWED and "Plaintiff's Request for Entry of Summary Judgment in Her Favor" (Docket No. 68) is DENIED.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge